UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RUTH DEBISSCHOP, | ) | |
| | ) | |
|    Plaintiff, | ) | |
| | ) | |
|       v. | ) | Case No. 3:19-cv-30078-KAR |
| | ) | |
| TOWN OF LONGMEADOW, | ) | |
| CARL MAZZAFERRO II and | ) | |
| EWEN MACEACHEM[1] | ) | |
| | ) | |
|    Defendants. | ) | |

MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
(Docket No. 25)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

Plaintiff Ruth DeBisschop ("Plaintiff") was arrested by Longmeadow Police Sergeant

Carl Mazzaferro II and Longmeadow Police Detective Ewen MacEachern (collectively,

"Defendants") for disorderly conduct and two counts of assault and battery on a police officer in

the aftermath of Plaintiff's grandson's arrest at the Pride Gas Station ("Pride Station") on

Longmeadow Street on August 3, 2016.  Plaintiff's complaint states three federal causes of action

against Defendants under 42 U.S.C. § 1983:  unlawful arrest (Count I); use of excessive force

(Count II); and cruel and unusual punishment (Count III).  Plaintiff's pendant state law claims are

assault and battery (Count IV), false arrest (Count V), malicious prosecution (Count VI), abuse

of process (Count VII), and negligence by the Town of Longmeadow ("Town") (Count VIII)

---

[1] The court will use the correct spelling of Defendant MacEachern's surname (Dkt. No. 27-6 at
6).

(Dkt. No. 1).  Plaintiff voluntarily dismissed Count III with prejudice (Dkt. No. 23).  Defendants have moved for summary judgment on all remaining claims.  Plaintiff does not oppose Defendants' motion for summary judgment on her claim for negligence against the Town (Count VIII) (Dkt. No. 25; Dkt. No. 32 at 1 n.1).  The parties have consented to this court's jurisdiction (Dkt. No. 11).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons that follow, Defendants' motion for summary judgment is DENIED.

II.    FACTUAL BACKGROUND[2]

A.    Plaintiff's Grandson's Arrest

On August 3, 2016, Plaintiff's grandson, B.G., lived at 100 Breckwood Drive in Longmeadow with Plaintiff (Dkt. No. 27 ¶¶ 10, 16).  At approximately 9:49:18 A.M., Mazzaferro, an eight-year veteran of the Longmeadow Police Department, and MacEachern, a five-year veteran of the department, were across the street from the Pride Station conducting surveillance for reported narcotics activity at that location when Mazzaferro observed a four-door tan Toyota with West Virginia license plates pull up to a gas pump ((Dkt. No. 27 ¶¶ 19, 21; Dkt. No. 27-4 at 18; Dkt. No. 27-6 at 9; Dkt. No. 31 ¶¶ 1-4).  The driver, B.G., with whom Mazzaferro was familiar, exited from the vehicle, entered the Pride Station convenience store, returned to the Toyota and leaned into the driver's side window before he ran south into Enfield,

---

[2] Defendants' exhibits to their Local Rule 56.1 Statement of Material Facts included the Pride Station's CCTV video recording of the events at issue, "Dkt. No. 27-11," and the audio and video recording of Plaintiff's booking at the Longmeadow Police Department, "Dkt. No. 27-12."  The authenticity of the recordings is not in dispute.  "[W]hen the record contains video evidence, the authenticity of which is not challenged, the court should ordinarily view the facts 'in the light depicted by the video evidence.'"  *O'Brien v. Town of Bellingham*, 943 F.3d 514, 531 (1st Cir. 2019) (quoting *Underwood v. Barrett*, 924 F.3d 19, 20 (1st Cir. 2019) (per curiam)).  The times noted herein are based on the video recordings.

Connecticut (Dkt. No. 27 ¶¶ 20, 21; Dkt. No. 27-11 at 9:49:31 A.M. to 9:54:07 A.M.; Dkt. No. 31 ¶¶ 6, 9).[3]  B.G. briefly returned to the Toyota.  He then went into the convenience store and used the store's telephone (Dkt. No. 27-11 at 9:58:07 A.M.).

E.S. was in the front passenger's seat of the Toyota (Dkt. No. 27 ¶ 29; Dkt. No. 31 ¶ 8).  At 9:59:11 A.M., a police officer, who was wearing a bright yellow shirt, approached the Toyota and appeared to engage E.S. in conversation (Dkt. No. 27-11; Dkt. No. 31 ¶ 11).  B.G. left the convenience store and joined the officer at the front passenger's side window of the Toyota at 9:59:42 A.M. (Dkt. No. 27-11).  MacEachern approached the Toyota shortly after B.G. arrived back at the car and asked E.S. if there were drugs in the vehicle (Dkt. No. 31 ¶¶ 12, 13).  When she answered, "no," MacEachern looked into the car through the driver's side window (Dkt. No. 27-11 at 10:02:42 A.M. to 10:03:10 A.M.; Dkt. No. 31 ¶ 13).

Mazzaferro, who was in uniform, arrived at the Pride Station at 10:03:53 A.M. (Dkt. No. 27-4 at 66-67; Dkt. No. 27-11; Dkt. No. 31 ¶ 14).  He spoke to B.G. in response to a report that there was an intoxicated man in the convenience store (Dkt. No. 27 ¶ 22; Dkt. No. 31 ¶ 7).  Because B.G. manifested indicia of narcotics use and stated that he had taken methadone or suboxone, Mazzaferro conducted field sobriety tests, which B.G. failed (Dkt. No. 27 ¶¶ 26, 27; Dkt. No. 31 ¶¶ 17, 18, 19).  Mazzaferro arrested B.G. for operating under the influence of narcotics (Dkt. No. 27 ¶ 28; Dkt. No. 31 ¶ 21).  B.G. "'started yelling to [E.S.] to drive the car'" or "'don't let them take the car'" (Dkt. No. 31 ¶ 22).  A Longmeadow officer transported B.G. from the Pride Station at 10:21:37 A.M. (Dkt. No. 27-11).

B.      The Search of the Toyota

_____

[3] The Pride Station is located at the state line between Massachusetts and Connecticut (Dkt. No. 27-9 at 8).

Because E.S. did not have a valid driver's license, Defendants decided that the Toyota should be towed (Dkt. No. 27 ¶¶ 30, 31; Dkt. No. 31 ¶¶ 24, 25). At approximately 10:22 A.M., Defendants began taking inventory of the contents of the vehicle as required by the Longmeadow Police Department's Towed Vehicle Inventory Policy (Dkt. No. 27 ¶¶ 32, 33; Dkt. No. 27-3 at 11-12; Dkt. No. 27-11; Dkt. No. 31 ¶¶ 25, 31). E.S. remained seated in the front passenger's seat of the Toyota (Dkt. No. 31 ¶ 31). MacEachern opened the back passenger door and Mazzaferro entered the front driver's side (Dkt. No. 31 ¶¶ 31, 32). At 10:25:29 A.M., E.S. got out of the car and walked toward the convenience store (Dkt. No. 27-11; Dkt. No. 31 ¶ 33). Mazzaferro also exited the vehicle (Dkt. No. 31 ¶ 33).

At 10:25:45 A.M., MacEachern emerged from the Toyota and began speaking to a Pride Station employee who stood near the front passenger's side door while she described B.G.'s problematic behavior inside the store before the officers arrived (Dkt. No. 27-11; Dkt. No. 31 ¶¶ 34, 35). At 10:27:18 A.M., the Toyota's front and back passenger's side doors were open as MacEachern continued his conversation with the clerk (Dkt. No. 27-11). MacEachern leaned into the front passenger's side of the car at 10:27:26 A.M. and again at 10:28:24 A.M. (Dkt. No. 27-11). The Pride Station clerk left MacEachern and the Toyota at 10:28:55 A.M. (Dkt. No. 27-11).

Meanwhile, Mazzaferro found a black backpack on the back seat that contained empty methadone bottles with B.G.'s name on them and an orange pill bottle (Dkt. No. 31 ¶ 36). Inside the pill bottle, Mazzaferro found a bundle of empty wax paper bags that were bound together with an elastic band (Dkt. No. 31 ¶ 36). Mazzaferro recognized the bundle as the way heroin was packaged and testified that the bags contained a "white powdery substance" (Dkt. No. 27-9 at 17, 29; Dkt. No. 31 ¶ 37). After Mazzaferro placed the orange pill bottle on the roof of the

car, MacEachern reached across the roof to examine it, then returned it to the roof (Dkt. No. 27-11 at 10:28:29 A.M. to 10:28:46 A.M.; Dkt. No. 30-3 ¶¶ 63, 64, 65; Dkt. No. 31 ¶¶ 38, 39).  At 10:30:35 A.M., MacEachern closed the back passenger's door and went to the driver's side of the Toyota (Dkt. No. 27-11).  The front passenger's side door remained open (Dkt. No. 27-11).

Defendants recovered narcotics and drug paraphernalia from under the front passenger's seat (Dkt. No. 27 ¶ 35; Dkt. No. 30 ¶ 35; Dkt. No. 31 ¶ 45).  E.S. was charged with possession of narcotics (Dkt. No. 31 ¶ 46).

C.    Plaintiff's Arrival at the Pride Station

B.G. was a drug addict with a history of substance abuse (Dkt. No. 27 ¶ 44).  Plaintiff knew that B.G. made daily trips to a methadone clinic with his girlfriend, K.W. (Dkt. No. 27 ¶ 43; Dkt. No. 27-1 at 70).  On August 3, 2016, K.W. called Plaintiff "in a panic" and asked Plaintiff to come to the Pride Station immediately (Dkt. No. 27 ¶ 38; Dkt. No. 31 ¶¶ 26, 27).  K.W. reported that the police "had" B.G. and the Toyota was being towed from the Pride Station (Dkt. No. 27 ¶ 38; Dkt. No. 30 ¶ 37; Dkt. No. 31 ¶ 27).

Neither B.G. nor Plaintiff owned the Toyota (Dkt. No. 27 ¶¶ 39, 40).  Although Plaintiff believed that K.W. owned the car, it was registered to K.W.'s grandfather, Edward Monroe of West Virginia (Dkt. No. 27 ¶ 42; Dkt. No. 27-4 at 45-46; Dkt. No. 30 ¶ 41; Dkt. No. 31 ¶ 23).

Plaintiff went to the Pride Station in response to K.W.'s phone call (Dkt. No. 27 ¶ 45; Dkt. No. 31 ¶ 29).  The Pride Station was extremely busy and Plaintiff observed "many people around" (Dkt. No. 27 ¶¶ 47, 48).  At 10:30:41 A.M., she proceeded across the parking lot toward the "commotion" near the Toyota that was parked at a gas pump (Dkt. No. 27 ¶¶ 45, 46, 49; Dkt. No. 27-11).  Plaintiff did not see B.G., but saw Defendants standing outside the Toyota: Mazzaferro was at the car's trunk; and MacEachern was standing at the open driver's side door

(Dkt. No. 27 ¶ 49; Dkt. No. 27-11 at 10:30:41 A.M.; Dkt. No. 30 ¶ 52; Dkt. No. 30-3 ¶ 72).

Plaintiff recognized Defendants as police officers (Dkt. No. 27 ¶¶ 11-15; Dkt. No. 30 ¶¶ 11-15).

Some of the vehicle's contents were on top of the Toyota (Dkt. No. 27 ¶ 53; Dkt. No. 30 ¶ 53;

Dkt. No. 30-3 ¶ 65; Dkt. No. 31 ¶¶ 38, 39). Plaintiff continued walking toward the Toyota (Dkt.

No. 27-11 at 10:30:44 A.M.).

D.     Plaintiff's Arrest

Defendants recognized Plaintiff as she approached them and the Toyota (Dkt. No. 27 ¶¶

52, 57; Dkt. No. 30 ¶ 52). Defendants told Plaintiff to leave (Dkt. No. 27 ¶ 56; Dkt. No. 30 ¶¶

55, 64). Plaintiff did not comply with Defendants' instructions and continued to approach them

and the car (Dkt. No. 27 ¶¶ 58, 59). She claims that she told the officers that she would leave if

they told her B.G.'s location (Dkt. No. 30 ¶¶ 55, 58, 64, 65; Dkt. No. 31 ¶ 52).

When Plaintiff got within five or ten feet of the Toyota at 10:30:47 A.M., Mazzaferro

stepped between her and the car and faced her to prevent her from reaching it (Dkt. No. 27 ¶ 67;

Dkt. No. 27-11; Dkt. No. 30 ¶¶ 69, 73; Dkt. No. 31 ¶ 53). At 10:30:54 A.M. MacEachern joined

Mazzaferro and stood to his left and to Plaintiff's right (Dkt. No. 27-11; Dkt. No. 30 ¶¶ 69, 73;

Dkt. No. 31 ¶ 53). Defendants blocked Plaintiff's direct path to the Toyota (Dkt. No. 27 ¶ 67).

The parties' accounts differ significantly at this point. Plaintiff "recall[ed] trying to

continue on" (Dkt. No. 27 ¶ 70). According to Plaintiff, as she started to step to her left to go

around Mazzaferro's right side, MacEachern began to "pursue" her and Mazzaferro moved "to

prevent Plaintiff from walking around him" (Dkt. No. 27-11 at 10:30:58.544 A.M., 10:30:59.153

A.M.; Dkt. No. 30 ¶ 69; Dkt. No. 31 ¶¶ 54. 55, 56). Plaintiff did not believe that she touched

either officer  (Dkt. No. 30 ¶ 74). By contrast, Defendants contended that Plaintiff initiated

contact with them as she continued advancing toward the Toyota (Dkt. No. 27 ¶¶ 69, 71, 72).

The parties agree that the officers then seized Plaintiff and placed her under arrest for disorderly conduct and two counts of assault and battery on a police officer (Dkt. No. 27 ¶ 91; Dkt. No. 30 ¶¶ 69, 72).

Plaintiff alleges that Defendants "slammed" her face into the side of a truck that was parked at the gas pump behind them as Defendants handcuffed her behind her back (Dkt. No. 30 ¶ 75; Dkt. No. 31 ¶ 57). Defendants deny that claim (Dkt. No. 27 ¶ 75). The Pride Station video shows that the physical encounter between Plaintiff and Defendants transpired over less than one minute (Dkt. No. 27 ¶ 77; Dkt. No. 27-11 at 10:30:41 A.M. to 10:31:23 A.M.).

     E.     <u>Plaintiff's Booking</u>

Plaintiff was transported to the Longmeadow Police Department where she was booked (Dkt. No. 27 ¶¶ 76, 80, 84). While awaiting booking, Plaintiff said to B.G., "I've done nothing," "resisted," "not turning around and leaving" (Dkt. No. 27-12 at 10:47:11 A.M.; Dkt. No. 30 ¶ 90).

The Longmeadow Police Department's booking procedure requires an inquiry into whether the arrestee has any injuries (Dkt. No. 27 ¶ 82). If an arrestee is injured, the injuries will be treated (Dkt. No. 27 ¶ 83). During booking, Plaintiff did not report that she was injured or required treatment (Dkt. 27 ¶ 94). She now states that she sustained a laceration on her left eyebrow and bruises to her right wrist from the handcuffs (Dkt. No. 27 ¶¶ 92, 93). The booking video shows Plaintiff using her right hand to sign papers and there are no visible injuries to her wrist or face (Dkt. No. 27 ¶¶ 95, 96, 97, 98; Dkt. No. 27-12 at 10:53).

     F.     <u>Proceedings in the Springfield District Court</u>

On August 4, 2016, Plaintiff was arraigned in the Springfield District Court on one count of disorderly conduct and two counts of assault and battery on a police officer (Dkt. No. 27 ¶

109; Dkt. No. 31 ¶ 58). A nolle prosequi was entered on both charges on November 22, 2016 (Dkt. No. 27 ¶ 110; Dkt. No. 31 ¶ 59).

III.    LEGAL STANDARD

The purpose of summary judgment is "'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) (citation omitted). "Summary judgment is appropriate when, based on the pleadings, discovery, and disclosure materials in the record, 'there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Ruggiero v. Am. United Life Ins. Co.*, 137 F. Supp. 3d 104, 111 (D. Mass. 2015) (quoting Fed. R. Civ. P. 56(a), (c)). "A 'genuine' dispute is one that, based on the supporting evidence, 'a reasonable [fact finder] could resolve . . . in favor of the nonmoving party,' and a 'material' fact is one that has 'the potential to affect the outcome of the suit under the applicable law.'" *Id.* at 111-12 (quoting *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (citations and quotation marks omitted)).

When reviewing a motion for summary judgment, the court views the facts "in the light most favorable to the non-moving party." *Zambrana–Marrero v. Suarez–Cruz*, 172 F.3d 122, 125 (1st Cir. 1999). "If the moving party satisfies the burden of showing, based on evidentiary material, that there is no genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate by reference to specific provable facts 'that a reasonable jury could return a verdict for the nonmoving party.'" *Ruggiero,* 137 F. Supp. 3d at 112 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "[C]onclusory allegations, improbable inferences, and unsupported speculation" are insufficient to establish a genuine dispute of material fact. *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

IV.    ANALYSIS

Plaintiff's remaining claims fall into three broad categories:  those based on the alleged absence of probable cause for her arrest (Counts I and V); those based on Defendants' purported use of excessive force (Counts II and IV); and those arising from Plaintiff's prosecution in the Springfield District Court (Counts VI and VII).  The court addresses the separate claims in each category in turn.

A.    Counts I and V:  Claims Based on Plaintiff's Arrest

1.    Count I:  Unlawful Arrest Under § 1983

Plaintiff asserts claims under 42 U.S.C. § 1983 (Dkt. No. 1, Counts I and II).  "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144, n.3 (1979)).  "To state a claim under Section 1983, a plaintiff must show [1] that the challenged conduct was committed by a person acting under color of state law and [2] that the conduct worked a deprivation of rights, privileges, or immunities secured by the Constitution or federal law."  *Diaz v. Devlin*, 229 F. Supp. 3d 101, 109 (D. Mass. 2017) (citing 42 U.S.C. § 1983; *Soto v. Flores*, 103 F.3d 1056, 1061 (1st Cir. 1997)).

In Count I, Plaintiff alleges that Defendants violated her Fourth Amendment right to be free from a false arrest.  *See Peña-Borrero v. Estremeda*, 365 F.3d 7, 12 (1st Cir. 2004) ("The Fourth Amendment guarantees individuals 'the right "to be secure in their persons . . . against unreasonable . . . seizures" of the person.'") (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)); *Camilo–Robles v. Hoyos,* 151 F.3d 1, 6 (1st Cir. 1998) ("The right to be free from unreasonable seizure (and, by extension, unjustified arrest and detention) is clearly established in

9

the jurisprudence of the Fourteenth Amendment (through which the Fourth Amendment constrains state action)."). There is no dispute that Defendants acted "under color of state law." *Diaz,* 229 F. Supp. 3d at 109. However, they contend that Plaintiff's arrest was supported by probable cause and was lawful or, if it was not, qualified immunity protects them from liability (Dkt. No. 26 at 4-6, 8-10).

    a.    Relevant Law

    i.    *Qualified Immunity Framework*

"The principle of qualified immunity shields a police officer from liability for civil damages when his conduct does not violate clearly-established statutory or constitutional rights of which a reasonable person would have known." *Nuon v. City of Lowell*, 768 F. Supp. 2d 323, 333 (D. Mass. 2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Castagna v. Jean,* 955 F.3d 211, 213 (1st Cir. 2020), *cert. denied,* 141 S. Ct. 896 (2020) ("Qualified immunity is 'an immunity from suit rather than a mere defense to liability.'") (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)). "When sued in their individual capacities, government officials like [Defendants] are immune from damages claims unless '(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time."'" *Castagna,* 955 F.3d at 219 (quoting *Eves v. LePage*, 927 F.3d 575, 582-83 (1st Cir. 2019) (en banc)). *See District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). "Courts may analyze either part of the test first." *Castagna*, 955 F.3d at 219.

"The 'clearly established' inquiry itself has two elements." *Id.* Plaintiff must first demonstrate that "the law was '"sufficiently clear" [such] that every "reasonable official would understand that what he is doing" is unlawful.'" *Wesby,* 138 S. Ct. at 589 (quoting *Ashcroft v. al-*

*Kidd,* 563 U.S. 731, 741 (2011)). "Qualified immunity is supposed to 'protect "all but the plainly incompetent or those who knowingly violate the law."' *Castagna,* 955 F.3d at 219 (quoting *Eves,* 927 F.3d at 583) (alteration omitted). "Because of that, the right that was allegedly violated must be defined 'in a particularized sense so that the contours of the right are clear to a reasonable official.'" *Id.* (quoting *Eves,* 927 F.3d at 583) (internal quotation marks omitted). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Eves,* 927 F.3d at 583 (quoting *al-Kidd*, 563 U.S. at 741).

The second element "focuses on the objective legal reasonableness of an official's acts," and "[e]vidence concerning the defendant's subjective intent is simply irrelevant." *Id.* (internal quotation marks and alteration omitted) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588, 590 (1998)). This element provides "some breathing room for a police officer even if he has made a mistake (albeit a reasonable one) about the lawfulness of his conduct." *Gray v. Cummings*, 917 F.3d 1, 10 (1st Cir. 2019) (quoting *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018)).

"The First Circuit has recognized the challenges of applying the qualified immunity standard at the summary judgment stage." *Hernandez v. Colon*, Civil Action No. 3:16-cv-30089-KAR, 2018 WL 2422008, at *5–6 (D. Mass. May 25, 2018) (citing *Washington v. Amand*, 308 F. Supp. 3d 497, 503 (D. Mass. 2018)).

> The difficulty arises because the summary judgment standard requires absolute deference to the nonmovant's factual assertions (as long as those assertions are put forward on personal knowledge or otherwise documented by materials of evidentiary quality), whereas qualified immunity, when raised on summary judgment, demands deference to the reasonable, if mistaken, actions of the movant.

*Morelli v. Webster*, 552 F.3d 12, 18–19 (1st Cir. 2009) (internal citations omitted). To ease the tension, the First Circuit instructs lower courts "to keep these competing standards logically distinct." *Morris v. Tivnan,* CIVIL ACTION NO. 14-40164-DHH, 2017 WL 1217109, at *5 (D.

Mass. Mar. 31, 2017).  The court should first identify "the version of events that best comports with the summary judgment standard . . . ."  *Morelli,* 552 F.3d at 19.  "In identifying that version of events, the summary judgment facts and reasonable inferences drawn therefrom are viewed in plaintiff's favor."  *Cardoso v. City of Brockton*, Civil Action No. 12-10892-DJC, 2014 WL 6698618, at *11 (D. Mass. Aug. 11, 2014).  *See Campos v. Van Ness,* 711 F.3d 243, 245 (1st Cir. 2013) ("when the parties tell two different stories, as is the case here, we typically must view the facts and draw all reasonable inferences in the non-movant's favor").  The court then "ask[s] whether, given that set of facts, a reasonable officer should have known that his actions were unlawful."  *Morelli*, 552 F.3d at 19.  "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

   *ii.*  *Probable Cause*

   Whether Plaintiff has adequately alleged a basis for a false arrest claim under § 1983 and whether Defendants are entitled to qualified immunity depends on whether Plaintiff's warrantless arrest was supported by probable cause as required by the Fourth Amendment.  "If probable cause existed to arrest, then there has not been a constitutional deprivation [under § 1983]."  *Sietins v. Joseph*, 238 F. Supp. 2d 366, 375 (D. Mass. 2003).  Conversely, it has long been well-established that an arrest without probable cause is a constitutional violation.  *See Prokey v. Watkins*, 942 F.2d 67, 74 (1st Cir. 1991).

   Probable cause "is not a high bar."  *Kaley v. United States*, 571 U.S. 320, 338 (2014).  "It does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands . . . ."  *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975).  Rather, it exists where "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing

that the [arrestee] had committed or was committing an offense." *United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir. 1987) (second alteration in original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

> Where "there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them," the existence of probable cause for an arrest is an issue for the jury; on the other hand, where the historical facts are established or undisputed, the issue becomes a mixed question of law and fact suitable for determination by the court.

*Nuon*, 768 F. Supp. 2d at 330 (quoting *Maxwell v. City of Indianapolis,* 998 F.2d 431, 434 (7th Cir. 1993)).

### b. Plaintiff's Arrest for Disorderly Conduct

Plaintiff was arrested for being a "disorderly person" in violation of Mass. Gen. Laws ch. 272, § 53. As relevant here, an individual is guilty of being a disorderly person if "(1) [s]he creates a hazardous or physically offensive condition by an act that serves no legitimate purpose of the individual; (2) [her] actions are reasonably likely to affect the public; and (3) [s]he either intended to cause public inconvenience, annoyance or alarm, or recklessly created public inconvenience, annoyance or alarm." *Damon v. Hukowicz,* 964 F. Supp. 2d 120, 138 (D. Mass. 2013) (citing *Commonwealth v. LePore,* 666 N.E.2d 152, 155 (Mass. App. Ct. 1996)). "[T]he Supreme Judicial Court has made it clear that 'the statute only can reach conduct "which involves no lawful exercise of a First Amendment right."'" *Nolan v. Krajcik*, 384 F. Supp. 2d 447, 459 (D. Mass. 2005) (quoting *Commonwealth v. Feigenbaum,* 536 N.E.2d 325, 327 (Mass. 1989) (quoting *Commonwealth v. A Juvenile,* 334 N.E.2d 617, 629 (Mass. 1975)). On the other hand, "'the mere fact that the conduct of the defendant was accompanied by speech does not preclude a conviction' under the disorderly conduct law." *Abraham v. Nagle*, 116 F.3d 11, 14 (1st Cir. 1997) (citing *Commonwealth v. Carson,* 411 N.E.2d 1337, 1337 (Mass. App. Ct. 1980)). There

is no dispute that the incident that culminated in Plaintiff's arrest occurred in the midst of heavy traffic at the multi-gas pump Pride Station and convenience store (Dkt. No. 27 ¶¶ 47, 48). Because the failure to obey police orders may create a dangerous condition, *see Abraham,* 116 F.3d at 14, and because it is undisputed that Plaintiff did not comply with Defendants' order that she stay away from the Toyota, the parties' dispute centers on whether or not Plaintiff can show that she had a legitimate purpose for her actions (Dkt. No. 26 at 5; Dkt. No. 32 at 10-11).

Defendants argue that they reasonably believed that Plaintiff committed the crime of disorderly conduct because she had no legitimate purpose for refusing to comply with their repeated instructions to stay away from the Toyota "that contained illegal narcotics" (Dkt. No. 26 at 5). The Pride Station's CCTV video recording shows Plaintiff proceeding across the parking lot toward Defendants who were searching the Toyota, which was parked at a gas pump (Dkt. No. 27-11 at 10:30:41 A.M.; Dkt. No. 27-9 at 30). Defendants decided to impound the car after they arrested B.G. for operating under the influence and determined that the passenger, E.S., did not have a valid driver's license (Dkt. No. 27 ¶¶ 28-31). *See Commonwealth v. Ellerbe,* 723 N.E.2d 977, 982 (Mass. 2000) (impoundment of the vehicle was lawful where the driver was arrested and the passenger did not have a valid driver's license available). Defendants' inventory search prior to impoundment was lawful. *See Commonwealth v. Oliveira,* 47 N.E.3d 395, 398 (Mass. 2016) ("'A lawful inventory search is contingent on the propriety of the impoundment of the [vehicle].'") (quoting *Commonwealth v. Brinson,* 800 N.E.2d 1032, 1035 (Mass. 2003)). An inventory search is undertaken to "'safeguard[] the car or its contents, protect[] the police against unfounded charges of misappropriation, protect[] the public against the possibility that the car might contain weapons or other dangerous instrumentalities that might fall into the hands of vandals, or a combination of such reasons.'" *Commonwealth v. Lek*, 164 N.E.3d 214, 217 (Mass.

App. Ct. 2021) (quoting *Commonwealth v. Baptiste*, 841 N.E.2d 734, 738 (Mass. App. Ct. 2006) (citation omitted)).

The parties dispute whether Defendants' inventory search became an investigatory search for evidence before Plaintiff arrived at the Pride Station. Defendants maintain that they recovered narcotics from the car before Plaintiff approached them (Dkt. No. 27-4 at 49-52, 68, 74-75; Tr. 27-6 at 30, 33). The station's CCTV video shows that, before Plaintiff's arrival, Mazzaferro recovered an orange pill bottle that contained a bundle of empty wax paper bags, which the officer supposedly recognized as being consistent with heroin packaging (Dkt. No. 27-9 at 17-18, 29; Dkt. No. 30-3 ¶ 63; Dkt. No. 31 ¶¶ 36, 37, 38). Mazzaferro placed the bottle on the roof of the Toyota (Dkt. No. 27-11 at 10:28:29 A.M.; Dkt. No. 30-3 ¶ 63; Dkt. No. 31 ¶ 38). MacEachern, who was on the passenger's side, examined the bottle and placed it back on the car's roof (Dkt. No. 27-11 at 10:28:43 A.M. to 10:28:46 A.M.; Dkt. No. 30-3 ¶¶ 64, 65; Dkt. No. 31 ¶ 39). At the suppression hearing, Mazzaferro testified that the empty wax paper bags contained what appeared to be heroin residue (Dkt. No. 27-9 at 17). According to Defendants, heroin residue in the pill bottle provided probable cause to search the Toyota for additional narcotics before Plaintiff arrived. *See Commonwealth v. Miller,* 318 N.E.2d 909, 911 (Mass. 1974) ("observation of contraband in a vehicle or on the person of an occupant of a vehicle provides probable cause for a complete search for more contraband.") (citing federal cases); *Commonwealth v. Skea,* 470 N.E.2d 385, 390 n.8 (Mass. App. Ct. 1982) (same); Mass. Gen. Laws ch. 94C, § 34 (unlawful to possess heroin of any amount); *see also United States v. Bell,* 197 F. App'x 11, 12, 14 n.2 (1st Cir. 2006) (unpublished) (observation of cocaine residue on a straw on the driver's door armrest provided probable cause to arrest the driver). In addition, MacEachern testified that, before Plaintiff arrived, he discovered a bag containing heroin residue

and narcotics paraphernalia under E.S.'s front passenger seat after E.S. got out of the car at 10:25:29 A.M. (Dkt. No. 27-9 at 29; Dkt. No. 27-11). That version of events finds some support in the Pride Station's CCTV video but is not conclusively established.

Defendants contend that, as Plaintiff proceeded toward them and the Toyota, she was "yelling" that they could not tow her car and she would take it home (Dkt. No. 27-4 at 51-55; Dkt. No. 27-6 at 30-31, 38-39; Dkt. No. 27-9 at 18, 30). Defendants claim that they had probable cause to arrest Plaintiff for disorderly conduct because she continued to loudly protest their impoundment of the car and did not obey their repeated commands to leave (Dkt. No. 27-1 at 75, 77, 86; Dkt. No. 27-4 at 51, 53-55, 68-69; Dkt. No. 27-6 at 32-33, 49; Dkt. No. 27-9 at 45, 46). Instead, she continued to approach the Toyota and got within five feet of the car when she allegedly initiated contact with Defendants as they attempted to block her path to the car and the narcotics they had found (Dkt. No. 27 ¶ 63; Dkt. No. 27-1 at 87; Dkt. No. 27-4 at 49-53, 55-56, 68, 72-75; Dkt. No. 27-6 at 32-36, 49; 27-9 at 46; Dkt. No. 27-11).

In discussing another aspect of G.L. c. 272, § 53, the Supreme Judicial Court noted that "while a 'specific standard is impractical' for defining the totality of behavior proscribed by G.L. c. 272, § 53, a potential defendant's 'common sense in most cases will define proscribed conduct.'" *Carson*, 411 N.E.2d at 1338 (quoting *Commonwealth v. Orlando,* 359 N.E.2d 310, 312 (Mass. 1977)). If that standard is applied to Defendants' version of events, there was no legitimate purpose for Plaintiff's attempt to interfere with Defendants' lawful inventory or investigatory search of the Toyota and, therefore, Defendants could reasonably believe that they had probable cause to arrest Plaintiff for disorderly conduct. *See Abraham,* 116 F.3d at 14 (the plaintiff's interference with officers' attempt to arrest the plaintiff's struggling companion "could not be a legitimate purpose on any view of the matter" and supported a finding of probable cause

to arrest the plaintiff for disorderly conduct); *Hatton v. Mullan,* No. 16-cv-11341-DJC, 2018 WL 3748162, at *3 (D. Mass. Aug. 7, 2018) (if the plaintiff prevented the officers' search of individuals for weapons by yelling at an officer, coming close to him, and making contact with him, the officers reasonably believed that they had probable cause to arrest the plaintiff for disorderly conduct).

This is a close case on these claims.  If, however, Plaintiff's version of the facts is accepted, Defendants could not have reasonably believed that she had engaged in illegal disorderly conduct.  Plaintiff disputes Defendants' contention that the car was a "crime scene" when she arrived.  According to Plaintiff, the orange pill bottle that Defendants placed on the roof the car before she arrived did not contain contraband (Dkt. No. 32 at 3).  Mazzaferro's police report does not indicate that the empty bags contained what appeared to be heroin residue (Dkt. No. 27-10).  As to the timing of the discovery of the bag allegedly containing heroin residue and drug paraphernalia under E.S.'s seat, Plaintiff contends that the CCTV video recording shows E.S. standing alone and holding a cell phone in front of the Pride convenience store as Plaintiff walked across the parking lot toward Defendants and the Toyota at 10:30:45 A.M. Plaintiff contends that E.S.'s position shows that E.S. was not under arrest and would support a finding that Defendants had not yet found the bag under E.S.'s seat (Dkt. No. 27-1 at 67, 80; Dkt. No. 27-11 at 10:30:45 A.M.).  Consequently, according to Plaintiff, Defendants were not conducting an investigatory search for evidence when she arrived.

Although Plaintiff testified that she intended to reach the car as she proceeded across the parking area, she denied yelling at Defendants and did not recall telling them that she owned the

Toyota (Dkt. No. 27-1 at 68, 75, 77; Dkt. No. 27-9 at 45, 46).[4] Rather, she stated that she was "there to take the vehicle to [her] home" (Dkt. No. 27-1 at 75, 86; Dkt. No. 27-9 at 38). In addition, Plaintiff allegedly told the officers that she wanted to see if B.G. was safe, would leave if they told her where B.G. was, and that she was not going to leave the Pride Station until they told her about his "disposition" (Dkt. No. 27-1 at 75, 77, 79, 86-88; Dkt. No. 27-9 at 42).

Plaintiff contends that she did not commit the crime of disorderly conduct because, in searching for her grandson, she had a "legitimate purpose" for her actions (Dkt. No. 32 at 11). *See Commonwealth v. Zettel*, 706 N.E.2d 1158, 1161 (Mass. App. Ct. 1999) ("'The import of the phrase [legitimate purpose] is broadly to exclude from this subsection any conduct that directly furthers some legitimate desire or objective of the actor.'") (quoting MODEL PENAL CODE § 250.4 cmt. 5 (Am. Law Inst., Official Draft 1980)). She wanted to be certain that her grandson was unharmed (Dkt. No. 27-1 at 87-88). Protection of a family member has been held to provide a legal basis to disobey a police officer's order. *See Zettel,* 706 N.E.2d at 1162 (a mother's interest in picking up her young on when he was released from school was a "legitimate interest" that warranted her refusal to obey an officer's orders to move her car). Consequently, accepting Plaintiff's version of events, a reasonable finder of fact could conclude that Defendants did not have probable cause to arrest her for disorderly conduct.[5]

---

[4] Shouting at a police officer is conduct protected by the First Amendment and, alone, cannot support a disorderly conduct charge. *See A Juvenile,* 334 N.E.2d at 629.

[5] Plaintiff contends that her attempt to take the car to her home after the driver, B.G., had left the Pride Station and while Defendants were conducting the inventory search was also a legitimate purpose for her actions (Dkt. No. 32 at 11). However, it is not clear that the law concerning inventory searches of vehicles in Massachusetts would require Defendants to honor Plaintiff's alleged request. Law enforcement officers are required to consider an owner or authorized driver's "lawful and practical alternative to impoundment of the vehicle," *Oliveira,* 47 N.E.3d at 399, but "it is not incumbent upon the police officers to offer reasonable alternatives [to impoundment]." *Commonwealth v. Bienvenu*, 828 N.E.2d 543, 546 n.4 (Mass. App. Ct. 2005)

Defendants' claim of qualified immunity does not alter that result. There is no dispute that the constitutional right to be free from arrest without probable cause was clearly established in 2016, *see Cox v. Hainey*, 391 F.3d 25, 30 (1st Cir. 2004), and that a legitimate purpose for disobeying a police order defeats a charge of disorderly conduct. *See Zettel,* 706 N.E.2d at 1161-62. Rather, the parties disagree as to the underlying facts. Defendants are not entitled to dismissal of Plaintiff's claims based on qualified immunity at this stage of the litigation. *See Prokey*, 942 F.2d at 73 ("if what the policeman knew prior to the arrest is genuinely in dispute, and if a reasonable officer's perception of probable cause would differ depending on the correct version, that factual dispute must be resolved by a fact finder").

  c.  Plaintiff's Arrest for Assault and Battery on a Police Officer

Plaintiff was also arrested for assault and battery on police officers. "An assault and battery is 'the intentional and unjustified use of force upon the person of another, however slight,' or the intentional commission of a wanton or reckless act (something more than gross negligence) causing physical or bodily injury to another." *Commonwealth v. Correia*, 737 N.E. 2d 1264, 1265-66 (Mass. App. Ct. 2000) (citations omitted). "Under Mass. Gen. Laws ch. 265, § 13D, a person commits the offense of assault and battery on a police officer if he engages in 'purposeful and unwelcomed contact with a person the defendant knows to be a law enforcement officer actually engaged in the performance of official duties.'" *LaFrenier v. Kinirey*, 478 F.

---

(citing *Commonwealth v. Caceres,* 413 Mass. 749, 751 n. 1, 604 N.E.2d 677, 679 n.1 (Mass. 1992)). Assuming that K.W. was an authorized driver and that she asked Plaintiff to retrieve the vehicle, there was no evidence that K.W. informed law enforcement officers that she was an authorized driver and had delegated Plaintiff to retrieve the vehicle as an alternative to impoundment. Defendants had no obligation "to locate or telephone the registered owner to determine his . . . wishes, or to wait with the vehicle [at a busy gas station] until a licensed driver [could] be located." *Oliveira,* 47 N.E.3d at 399 (citation omitted).

Supp. 2d 126, 136 (D. Mass. 2007) (quoting *United States v. Santos*, 363 F.3d 19, 23 (1st Cir. 2004)). "Neither violence nor the use of force is an essential element of the offense." *Id.* "'The offensive touching may be direct, as by striking another, or it may be indirect, as by setting in motion some force or instrumentality with the intent to cause injury.'" *Commonwealth v. Cohen*, 771 N.E. 2d 176, 178 (Mass. App. Ct. 2002) (quoting *Commonwealth v. Dixon*, 614 N.E. 2d 1027, 1029 (Mass. App. Ct. 1993)). Ultimately, "[t]he affront to the victim's personal integrity is what makes the touching offensive." *Id.* (quoting *Commonwealth v. Burke*, 457 N.E. 2d 622, 624 (Mass. 1983)).

The evidence raises a factual question as to whether Plaintiff committed an assault and battery on the police officers by initiating contact with Defendants. The Pride Station CCTV video does not clearly depict the interaction between Plaintiff and Defendants at the critical time (Dkt. No. 27-11 at 10:30:54 A.M. to 10:30:59 A.M.). The video recording shows Defendants standing together blocking Plaintiff's direct path to the car (Dkt. No. 27-4 at 72; Dkt. No. 27-11 at 10:30:54 A.M.). According to Defendants, Plaintiff touched them as she attempted to get past them to reach the car which contained evidence (Dkt. No. 27-4 at 49-53, 55-56, 73-74; Dkt. No. 27-6 at 30, 33-36, 41-44; Dkt. No. 27-9 at 17-18). While awaiting booking, Plaintiff told B.G. that she "resisted" and did not "turn[] around and leave[]" (Dkt. No. 27-12 at 10:47:11 A.M.; Dkt. No. 30 ¶ 90). Plaintiff, on the other hand, asserts that Defendants seized her as she tried to walk around Mazzaferro to get closer to the car (Dkt. No. 27-1 at 78-79; Dkt. No. 31 ¶¶ 54-57). She did not believe that she came into contact with Defendants before they "grabbed" her (Dkt. No. 27-1 at 87). While awaiting booking, Plaintiff told B.G., "I've done nothing" (Dkt. No. 27-12 at 10:47:11 A.M.; Dkt. No. 30 ¶ 90).

In view of the settled law of assault and battery on a police officer, which requires an offensive touching, *see Cohen,* 771 N.E.2d at 178, if Plaintiff's version of events is credited, a finder of fact could conclude that reasonable officers would have recognized that they lacked probable cause to arrest her for assault and battery because she did not initiate contact with them. Viewing the evidence in the light most favorable to Plaintiff, Defendants are not entitled to qualified immunity, and summary judgment is inappropriate. *See Hatton,* 2018 WL 3748162, at *3 ("it is inappropriate to grant a qualified immunity defense at summary judgment where the defense is premised on a factual dispute.").

### 2. Count V: Common Law False Arrest

In addition to the § 1983 claim for unlawful arrest, Plaintiff asserts a common law claim for false arrest. "To maintain a cause of action for false arrest under Massachusetts law, a plaintiff must establish that 1) the defendant arrested the plaintiff and 2) without probable cause." *Eason v. Alexis,* 824 F. Supp. 2d 236, 241 (D. Mass. 2011) (citing *Lucas v. City of Boston,* Civil Action No. 07-cv-10979-DPW, 2009 WL 1844288, at *25 (D. Mass. June 19, 2009)). For the reasons stated in the discussion of the § 1983 claim, whether Defendants had probable cause to arrest Plaintiff presents a genuine question of material fact. *See Hatton,* 2018 WL 3748162, at *2 ("A false arrest claim under either Section 1983 or state law requires a showing that the officer did not have probable cause to perform the arrest.") (citing *Acosta v. Ames Dep't Stores, Inc.,* 386 F.3d 5, 9 (1st Cir. 2004)). Consequently, summary judgment is denied as to Count V.

In sum, Defendants' motion for summary judgment is denied as to Counts I and V.

### B. Counts II and IV: Claims Based on Defendants' Alleged Use of Excessive Force

### 1. Count II: § 1983 Claim

"The right to make an arrest carries with it the right to use some degree of force." *Bird v. City of New Bedford,* Civil Action No. 17-12159-FDS, 2019 WL 4394914, at *4 (D. Mass. Sept. 13, 2019). "In evaluating whether an officer used excessive force in violation of a plaintiff's constitutional rights, the key question is 'whether "the defendant officer employed force that was reasonable under the circumstances."'" *Hatton,* 2018 WL 3748162, at *4 (quoting *Raiche v. Pietroski,* 623 F.3d 30, 36 (1st Cir. 2010)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396. "The [reasonableness] inquiry requires weighing the severity of the crime[s] at issue, whether the suspect posed a safety risk to the officers or others, and whether the suspect was actively resisting arrest or attempting to flee." *Hatton,* 2018 WL 3748162, at *4; *see also Graham,* 490 U.S. at 396.

Although there is no dispute that the charges of disorderly conduct and assault and battery on a police officer were misdemeanors and that Plaintiff was outnumbered by much larger, younger Defendants, there are genuine disputes of fact as to whether Defendants used excessive force when arresting and handcuffing Plaintiff (Dkt. No. 27-4 at 7; Dkt. No. 27-6 at 46-47; Dkt. No. 31 ¶ 57). According to Defendants, they applied reasonable force in view of Plaintiff's failure to obey their repeated orders to leave the area, her proximity to a car that contained narcotics evidence, and her resistance to being handcuffed (Dkt. No. 27 ¶ 63; Dkt. No. 27-4 at 74-75; Dkt. No. 27-6 at 47, 48, 49). Defendants deny that her head hit the truck that was parked near the Toyota when they placed her in handcuffs (Dkt. No. 27-4 at 77; Dkt. No. 27-6 at 50). In contrast, Plaintiff contends that the officers "slammed" her face into the truck when they turned her around, put her arms behind her back, and handcuffed her (Dkt. No. 27-1 at 78). *See Morris,* 2017 WL 1217109, at *4 (denying summary judgment where plaintiff and defendants

disputed whether or not a defendant "smashed" the plaintiff's head into a fence during his arrest). That Plaintiff did not report injuries at the Pride Station or during booking and that her booking video did not depict visible injuries to her face or right wrist is not dispositive (Dkt. No. 27 ¶¶ 79, 84, 94, 95, 96, 98). "Although the seriousness of the injury is a relevant consideration in evaluating the reasonableness or force, this factor does not negate a dispute as to the amount and manner of the force allegedly used." *Morris,* 2017 WL 1217109, at *4 n.7 (citing *Bastien v. Goddard,* 279 F.3d 10, 14 (1st Cir. 2002)).

Plaintiff's version of events, if credited, might prove that Defendants used an unreasonable amount of force, thereby violating her Fourth Amendment right to freedom from excessive force, which right was "clearly established at the time of the assault." *Bird,* 2019 WL 4394914, at *4. "The use of violence against individuals who pose no safety threat is clearly unreasonable, and that fact would have been understood by an objectively reasonable officer." *Id.* (citing *Asociacion de Periodistas de P.R. v. Mueller,* 529 F.3d 52, 60-61 (1st Cir. 2008)). Consequently, a fact finder could determine that the use of force by Defendants was objectively unreasonable and, therefore, they are not entitled to qualified immunity or summary judgment on Count II, Plaintiff's § 1983 excessive force claim.

2.      Count IV:  Common Law Assault and Battery Claim

Plaintiff also claims that Defendants committed an assault and battery when they slammed her into the truck while effectuating her arrest. "Massachusetts law allows for assault and battery claims against police officers who use excessive force in conducting an arrest." *Raiche*, 623 F.3d at 40 (citing *Powers v. Sturtevant,* 85 N.E. 84, 84 (Mass. 1908)). "However, Massachusetts law also allows an officer to use reasonable force in conducting a lawful arrest: reasonable force is a valid defense to assault and battery." *Id.* (citing *Dean v. City of Worcester,*

924 F.2d 364, 369 (1st Cir. 1991)). "Where a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, [the court's] determination of the reasonableness of the force used under § 1983 controls [its] determination of the reasonableness of the force used under the common law assault and battery claims." *Id.* Because there is a genuine factual dispute as to whether Defendants used excessive force, they are not entitled to summary judgment on Count IV.

     C.    <u>Counts V and VI: Claims Concerning Plaintiff's Springfield District Court Prosecution</u>

     1.    Count VI: Malicious Prosecution

In Count VI, Plaintiff contends that her arrest constituted malicious prosecution by Defendants. To prevail on a claim of malicious prosecution under Massachusetts law, a plaintiff must prove: "(1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; (2) the termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges; and (4) actual malice." *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001) (citing *Correllas v. Viveiros,* 572 N.E.2d 7, 10 (Mass. 1991)).

The first element is satisfied by the evidence that Defendants arrested Plaintiff for disorderly conduct and assault and battery on a police officer and that Plaintiff was prosecuted. *See Campbell v. Casey,* 166 F. Supp. 3d 144, 153 (D. Mass. 2016); *Gutierrez v. Mass. Bay Transp. Auth.,* 772 N.E.2d 552, 562 (Mass. 2002). There is a factual dispute as to whether the criminal proceedings terminated in Plaintiff's favor (Dkt. No. 26 n.2; Dkt. No. 32 n.13). In Massachusetts, "a criminal prosecution terminates 'in favor of the plaintiff when the district attorney formally abandons the criminal proceedings by a nolle prosequi or a motion to dismiss' as long as 'the reasons stated for the nolle prosequi or dismissal [are] consistent with the

innocence of the accused.'" *Boyle v. Barnstable Police Dep't*, 818 F. Supp. 2d 284, 303 n.31 (D. Mass. 2011) (alteration in original) (quoting *Wynne v. Rosen,* 464 N.E.2d 1348, 1351 (Mass. 1984)). "'The circumstances of the abandonment must . . . compel an inference that there existed a lack of reasonable grounds to pursue the prosecution.'" *Id.* (quoting *Wynne,* 464 N.E.2d at 1351). Defendants claim that the prosecutor consulted them before entering a nolle prosequi of the charges against Plaintiff and they agreed to that disposition because Plaintiff apologized and indicated that she understood that she could not interfere with a police investigation (Dkt. No. 27-4 at 85-86; Dkt. No. 27-6 at 51-52). In contrast, Plaintiff denies that she spoke to the prosecutor or Defendants or apologized prior to the disposition of the case (Dkt. No. 27-1 at 110-12).[6] Assuming that Plaintiff can show that the proceedings terminated in her favor, for the reasons previously discussed, there is a genuine factual dispute as to whether Defendants had probable cause to arrest Plaintiff. Because the fourth element, malice, may be inferred from a lack of probable cause, whether Defendants acted with malice is also in dispute. *Campbell*, 166 F. Supp. 3d at 153 (quoting *Limone v. United States*, 579 F.3d 79, 89 (1st Cir. 2009)). In addition, questions of motive or intent generally are not conducive to resolution on a motion for summary judgment. *See Acosta Colon v. Wyeth Pharms. Co.*, 363 F. Supp. 2d 24, 28 n.7 (D.P.R. 2005), *amended on reconsideration in part sub nom. Acosta Colón v. Wyeth Pharms. Co., Inc.,* No. Civ. 03-2327 DRD, 2006 WL 508094 (D.P.R. Mar. 1, 2006) ("Issues of motive and intent are usually not appropriate when in summary judgment for these are questions better suited to be resolved by the trier of facts.") (citing *Pullman–Standard v. Swint,* 456 U.S. 273, 288–90 (1982);

---

[6] Although the nolle prosequi was exhibit 2 at Plaintiff's deposition, it was not included in the summary judgment record (Dkt. No. 27-1 at 3, 113).

*Lipsett v. Univ. of P.R.,* 864 F.2d 881, 895 (1st Cir. 1988)).  Accordingly, Defendants' motion for summary judgment on Count VI is denied.

2.　　Count VII:  Abuse of Process

Finally, Defendants argue that they are entitled to summary judgment on Plaintiff's abuse of process claim.  Plaintiff counters that Defendants commenced the prosecution in a "misguided attempt to protect themselves from civil liability" (Dkt. No. 32 at 15).

In Massachusetts, a claim for abuse of process has three elements:  "(1) 'process was used,' (2) 'for an ulterior or illegitimate purpose,' (3) 'resulting in damage.'"  *477 Harrison Ave., LLC v. JACE Boston, LLC*, 134 N.E.3d 91, 104 (Mass. 2019) (quoting *Millennium Equity Holdings, LLC v. Mahlowitz,* 925 N.E.2d 513, 522 (Mass. 2010)).  There is no dispute that Defendants initiated criminal proceedings against Plaintiff.

"[A]n ulterior motive is an essential element of the tort of abuse of process when the claim is based solely on commencement of an action." *Ladd v. Polidoro*, 675 N.E.2d 382, 384 (Mass. 1997).  An ulterior motive "is not simply the intent to harm the other party directly by bringing suit, but rather the intent to gain some other end indirectly." *Psy–Ed Corp. v. Klein,* 947 N.E.2d 520, 535 n.35 (Mass. 2011).  "There must be an ulterior purpose '"to gain some collateral advantage," which "has been compared to extortion, in that the defendant has allegedly tried to extract some advantage by wrongful means."'" *Cardoso,* 2014 WL 6698618, at *18 (quoting *Damon,* 964 F. Supp. 2d at 141).

Although "an abuse of process claim can lie whether or not there was probable cause" to arrest, *Faust v. Coakley,* Civil Action No. 07-11209-RWZ, 2008 WL 190769, at *4 (D. Mass. Jan. 8, 2008), and although an officer's knowledge that he lacked probable cause for an arrest does not, alone, satisfy the ulterior purpose element, *see Lund v. Henderson*, 22 F. Supp. 3d 94,

108 (D. Mass. 2014), the fact that the arresting officer knew or had reason to know that the arrest was not supported by probable cause is relevant "as tending to show that the process was used for an ulterior purpose." *Fishman v. Brooks*, 487 N.E.2d 1377, 1383 (Mass. 1986). Plaintiffs have asserted viable claims of abuse of process where police officers have instituted criminal charges to "cover up their misdeeds," such as arresting a plaintiff without probable cause or using excessive force, as alleged here. *Eason*, 824 F. Supp. 2d at 243. *See Philbrook v. Perrigo*, 637 F. Supp. 2d 48, 54-55 (D. Mass. 2009) (denying summary judgment on abuse of process claim where it was reasonable to infer that officers initiated process to cover up their wrongful arrest of the plaintiff). In addition, similar to the claim of malicious prosecution, Plaintiff's claim for abuse of process raises a question about Defendants' motivation which is not conducive to resolution on a motion for summary judgment. *See Mulero–Rodríguez v. Ponte, Inc.,* 98 F.3d 670, 677 (1st Cir. 1996) ("determinations of motive and intent . . . are questions better suited for the jury") (quoting *Petitti v. New England Tel. & Tel. Co.,* 909 F.2d 28, 34 (1st Cir. 1990)). For these reasons, Defendants' motion for summary judgment on Count VII is denied.

V.    CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Dkt. No. 25) is DENIED. The parties are directed to appear at a status conference on July 12, 2021 at 11:00 a.m. If that date is not convenient, the parties are to confer with the Clerk's Office to select an alternative mutually convenient date and time.

It is so ordered.

Dated: June 21, 2021                                      /s/ Katherine A. Robertson
                                                         KATHERINE A. ROBERTSON
                                                         U.S. MAGISTRATE JUDGE